**ANTHONY M. MEYERSTEIN, Inc.**

v.

**The UNITED STATES.**

No. 49647.

United States Court of Claims.

July 12, 1957.

Albert Foreman, New York City, for plaintiff. M. Carl Levine and Morgulas & Foreman, New York City, were on the briefs.

John F. Wolf, Washington, D. C., with whom was Assistant Attorney General George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff sues for costs allegedly incurred by it as a result of an alleged breach of a contract between it and defendant, under which plaintiff undertook to manufacture for defendant twelve floating cranes, as well as to supply maintenance tools, spare parts, final drawings, and instruction book therefor.

The chief controversy is whether defendant was obligated to accept delivery of the parts for the cranes as they were manufactured, and before one crane

had been assembled and had satisfactorily passed the test provided for. Defendant refused to do so. Plaintiff says defendant was required to do so, and that its breach of this obligation required plaintiff to store the parts at a cost of $190,521.49. This is the main item of its claim. The other items will be stated later.

There is no specific provision of the contract that deals with the subject of the controversy. To resolve the dispute it is necessary to consider those contract provisions which are at all pertinent, the purpose for which the cranes were purchased and the place of delivery, and the construction placed upon the contract by the parties to it.

As appears from the correspondence and negotiations between the parties, the cranes were contracted for by the United States for the purpose of shipping them to France for use by the French Government under the Lend-Lease Act, 22 U.S.C.A. § 411 et seq. The parts for the cranes were to be manufactured by plaintiff and delivered to defendant for shipment to France, and there assembled by the French Government. This fact should be borne in mind in construing section 1–01 of the General Clauses of the contract, and its other provisions. Section 1–01 reads:

> "*Scope of the Contract.* The Contract shall include design and construction of 12 floating revolving cranes of 6 metric ton capacity, as well as the supply of maintenance tools, of spare parts and of final drawings.

> "One crane out of 12 cranes of 6 metric ton capacity shall be erected, complete with barges, and tested in accordance with procedure described in Section 3–07. After satisfactory completion of the tests the cranes and barges shall be again disassembled and prepared for shipping."

A crane is composed of many parts. These were to be so designed and manufactured by plaintiff as to produce a crane that would satisfactorily do the work desired. Any defective, inadequate, or unsuitable part might prevent the crane from operating satisfactorily. It seems unreasonable to suppose, therefore, that defendant was obligated to accept any part for shipment to France until it knew that the sum of all the parts would produce the thing it wanted, which was a complete crane which would do satisfactorily certain specified work. Having been assured of this, defendant was then ready to accept delivery of the parts for shipment to France, but not before then. It would have been foolish to have shipped parts to France until it had been determined that they were the right parts to make up a crane that would operate satisfactorily.

Take for instance the luffing mechanism and the engine to operate it: plaintiff's design for them was an unusual design which had not been proven by actual operation to be acceptable. It would have been worse than foolish for the defendant to have shipped them to France until after they had been assembled with other parts into a complete crane and the whole had operated satisfactorily.

There was no provision in the contract requiring defendant to accept the parts before it was ready to ship them to France. Article 10 of the contract, dealing with "delivery and payment when shipping instructions are delayed," is of no help, because in subparagraph (d) it is provided:

> "The foregoing paragraphs (a), (b) and (c) shall apply to partial deliveries of completed articles during the term of the contract only if such partial deliveries are required or permitted by the terms of the contract as to delivery."

This provision was a part of the standard "Procurement Division Contract Terms No. 6," which defendant had said, in accepting plaintiff's proposal, would be incorporated in the formal contract. It has no application to the present controversy.

There is no other provision of the contract that has any bearing on the controversy.

The construction of the contract by the parties, however, clearly shows that both of them understood that defendant was not obligated to accept delivery until after the test of the completed crane had been, or should have been, made.

The contract was executed by plaintiff on September 11, 1945. On October 20, 1945, plaintiff wrote defendant a letter, in which it said:

"In connection with the above noted contract, we have requested shipping instructions which seemingly are not available at this time. Consequently, it is imperative that we make arrangements to store completed equipment. *Inasmuch as our contract does not provide for this storage,* we would appreciate receiving an amendment to the contract authorizing us to provide for such storage facilities at a price to be negotiated and mutually satisfactory." [Italic ours.]

On November 29, 1945 plaintiff's president wrote the company's agent in Washington, District of Columbia, instructing him to secure an addendum to the contract containing the following provisions:

"1. Contract time extended to May 14, 1946 as agreed.

"2. Partial shipments can be made as completed.

"3. In order to allow partial shipments, it shall be provided that the last crane will be the one to be erected and tested in this country.

"4. Warehousing of any parts that are held for shipment shall be for the account of Treasury Procurement.

"5. The Contractor agrees that subject to the certification of his erection supervisor, any defects or misfits found in his work after it has been delivered in France will be rectified by him without charge to the Purchaser.

No such addendum was ever made, although afterwards, and on at least four different occasions, the contract was amended in other respects.

*Again, on April 16, 1946,* plaintiff wrote defendant, in which it said:

"We have been unable to procure shipping instructions from the French Supply Council in connection with the various parts of the above noted contract.

\*    \*    \*    \*    \*    \*

"We are now in a position where our plants and yards are becoming overloaded with the various parts of the cranes and pontoons. We therefore kindly request that you contact the French Supply Council and forward to us firm shipping instructions so that delivery may be started."

In reply to this letter, defendant said:

"It is impossible to issue shipping instructions at this time inasmuch as the contract stipulated that one machine would be successfully operated in a test run. \*   \*   \*"

Then, on April 27 plaintiff wrote defendant, in which it said:

"Reference 2.—We respectfully request your permission to ship completed portions of the subject contract to your warehouse or stock yard pending shipment overseas as our plants and yards are becoming overloaded with completed portions of the cranes and pontoons."

In reply, defendant wrote plaintiff a letter in which it said:

"Receipt is acknowledged of your letter of April 27, 1946 in reply to Procurement Division letter of April 23, 1946, in which you request shipping instructions in order to relieve your storage facilities at your plant.

"A letter has just been received from the French Supply Council, Chief of Maritime Port Equipment, advising that they will supply shipping marks so that the different parts could be satisfactorily marked to insure the best results in shipping. Therefore, the marking in-

structions are being prepared and will be forwarded to you under separate cover. It may be possible that shipping instructions may be submitted at this time. However it is not to be construed that these shipping instructions are to be used for the shipping of the machines at this time, as the contract provides that one of these machines is to be successfully operated in a test before any shipment of any crane can be made.

"With regard to your request for permission to ship completed portions of the cranes to a Procurement Division warehouse, you are advised that there are no such warehouses available, and it would be impossible for the Procurement Division to negotiate a contract for such a warehouse or otherwise store completed sections. It would also prove unsatisfactory to move this equipment to one of the staging areas due to the cost of moving and handling the equipment from your yards. It is therefore suggested that arrangements be made for a test of one completed crane, at which time arrangements may be made to have the items prepared for shipment."

Again, on July 9, 1946, plaintiff wrote defendant a letter, in which it said:

"Unfortunately this tremendous tonnage, which we can ill afford to store, is now seriously handicapping the progress of our work to the extent that we request your cooperation in endeavoring to find a suitable outside storage pending shipping instructions.

"*As we informed you, we shall be glad to pay any reasonable storage charges.* You have suggested that it might be possible to make arrangements for temporary storage at some of the Army depots that may not be too overcrowded.

"Recently we sent to you a copy of a letter received from Gibbs and Hill, dated June 28, 1946, wherein they request copies of certain drawings which they intend to send to France to prepare for the proper erection and launching of the barges. These barges have been completed for many months past, and if we could store the barges alone, it would relieve our shops of approximately 3,500 tons of fabricated steel.

"We shall appreciate any assistance that you may be able to render in this matter. [Italics ours.]"

On August 16, 1946, plaintiff wrote defendant requesting it to permit plaintiff to ship the twelve barges on which the cranes were to be erected.

In reply, defendant wrote plaintiff, in which defendant said:

"In view of the fact that these barges are congesting your shops and will play no part in the actual test operation of the crane, you are authorized to ship upon receipt of proper shipping instructions from the Procurement Division. It is therefore suggested that you apply to the regional office in New York for shipping instructions.

"The acceptance of delivery of these barges is in no way to be construed as an acceptance of the complete machine as it will be necessary to make a complete test of one crane before the acceptance of all cranes."

All of this goes to show that both parties understood that there was no obligation on defendant to accept delivery of parts of the cranes until after a complete crane had been assembled and had satisfactorily passed the test.

It is clear that they understood that the cost of storing and caring for the completed parts in the meantime was the responsibility of the plaintiff. This is clearly shown by the foregoing quotation from plaintiff's letter of July 9 to defendant, in which it said:

"Unfortunately this tremendous tonnage, which we can ill afford to store, is now seriously handicapping the progress of our work to the extent that we request your cooperation in endeavoring to find a suitable

'outside storage pending shipping instructions.

"As we informed you, we shall be glad to pay any reasonable storage charges. * * *"

This would seem to dispose of plaintiff's claim for storage charges up to the time the parties met in New York City on December 19, 1946 to arrange for a test of a completed crane.

At that time defendant proposed a test of the crane, which plaintiff claimed went beyond the test required by the contract, and for this reason it refused to participate in the proposed test. Whether or not the proposed test was within the scope of the contract is not easy to determine.

Under section 3, headed "Main Characteristics of the Cranes," the test to which the crane was to be subjected was set out in detail.

The Test Agenda proposed by defendant on December 19, 1946, went into much greater detail than the test set out in the contract. However, defendant claims that it was within the scope of the test set out in the contract, and, even if this is not so, it was justified, because the luffing mechanism proposed to be used by plaintiff had not been "in successful operation for at least one year," at least in this country, as required under section 5 relating to structural work, and as required under section 8 relating to electrical work. At any rate, since the luffing mechanism proposed was one with which defendant's engineers were not acquainted, they were uncertain of its operational efficiency, and they wanted to make sure, by what they regarded as necessary tests, that it would operate satisfactorily. They say the proposed test was justified for the additional reason that the manufacturer of the Gray Marine Diesel engines, which plaintiff proposed to use, had stated that it was a "souped-up" version of the regular model, and concluded that it did not desire to recommend the operation of the engine at 1800 RPM, the required speed, in continuous service without further details as to the nature of the application.

The tests provided for were tests made necessary by plaintiff's failure to provide a luffing mechanism and other mechanical devices which had been in successful operation for a year.

They were perhaps justified under subparagraph (c) in section 3–07, relating to "test of proper functioning and efficiency." This paragraph reads:

"(c) The brakes shall not show any abnormal heating. *Moreover, either during the course of the tests described above, or apart from these tests, all necessary investigations required to make sure that the principal equipment and accessories are well established shall be undertaken.* In particular, the proper operation of the brakes, of the limiting devices and of the bucket shall be tested as well as the precision of the hoisting operations, the slewing and luffing in a general way." [Italics ours.]

That the tests required by the defendant were justified seems to be confirmed by what followed the refusal of the plaintiff on December 19 to submit the cranes to the tests proposed.

On December 28 plaintiff wrote the defendant that the American Bureau of Shipping had subjected the cranes to the tests provided for in the contract, and that they had certified that they operated satisfactorily, and that they had issued a test certificate, which plaintiff construed to be a certificate of satisfactory operation, and they, therefore, asked for shipping instructions.

Following this, defendant on January 8, 1947, wrote plaintiff asking it to state exactly what features of defendant's proposed tests were considered to be beyond the contract specifications. Plaintiff replied generally that all tests not specifically listed in the contract were beyond the contract terms.

On February 19, 1947 defendant wrote plaintiff that it thought that the tests proposed were within the scope of the contract, and asked plaintiff when it would be ready to submit the crane to this test. Plaintiff treated this letter

as a decision of the contracting officer on the dispute, and took an appeal to the head of the department, but the head of the department refused to rule on it, stating that the party who had written the letter of February 19, 1947 was not the contracting officer, and that, if the parties could not agree on the matter, he would have the dispute submitted to the contracting officer for a decision on all questions of fact, such as the question of whether or not the level luffing arrangement, and the generating power plant had been in successful operation for at least one year.

Nothing further was done until June 5, 1947, when defendant again inquired of plaintiff when it would submit the crane for the test proposed. In reply, plaintiff again asserted that the proposed test was beyond the terms of the contract.

Then, on July 15, the contracting officer wrote plaintiff, finding that the—

"* * * Test Agenda to be conducted on a Prototype Barge Mounted Crane constructed in accordance with said contract (a copy of which Test Agenda has previously been furnished to you) are entirely within the scope of said contract.

"Demand is therefore again made that said crane be tested according to said tests, without further delay."

Plaintiff made no further protest, and on August 14, 1947 submitted the crane to the test defendant had demanded.

Plaintiff's acquiescence in the contracting officer's decision tends to confirm defendant's construction of the contract. The detailed tests insisted upon by defendant were made necessary because plaintiff supplied essential parts that had not been in successful operation for a year, and this made it necessary for defendant to invoke the provision of section 3–07 of the contract, reading, "all necessary investigations required to make sure that the principal equipment and accessories are well established shall be undertaken."

On the whole, we are of the opinion that the test demanded was proper and, therefore, that defendant is not liable for the cost of storing the parts until the test was actually made. After the tests had been made, shipping instructions were issued in due course.

█ It follows that plaintiff is not entitled to recover for the storage charges which it claims, nor for reconditioning the parts which had become rusted, nor for insurance premiums on the parts prior to delivery, nor its legal expenses in defending the proceedings to dispossess it from the yard upon which some of the material was stored. However, plaintiff is entitled to recover the following items.

Some of the parts were manufactured by a subcontractor in Phoenixville, Pennsylvania. Upon acceptance of these items by defendant, it paid for their shipment by rail to New York for export. Since plaintiff was obligated to make delivery to defendant at its Long Island City plant, defendant charged it with freight expenses in the amount of $2,099.27, and withheld this amount from the sums due it. The amount withheld was in excess of the actual freight charges as shown by the bills of lading, in the amount of $799.67. This sum plaintiff is entitled to recover.

█ At defendant's request, plaintiff provided a crew of men to load the crane parts on lighters to be furnished by defendant. Defendant delayed in providing the lighters, and plaintiff was accordingly required to pay the sum of $2,531.08 for standby labor. Plaintiff is entitled to recover this amount.

There is a balance remaining due on the contract price of $2,590.96. This amount plaintiff is also entitled to recover.

Judgment will be entered against the defendant in favor of plaintiff in the sum of $5,921.71.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.